IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

JASON ENGEL, ET AL          NO. 5:15-CV-26-RP
Each Individually and
on Behalf of All Others
Similarly Situated

VERSUS

S-3 PUMP SERVICE, INC.

30(b)(6) DEPOSITION OF S-3 PUMP SERVICE, INC.
DEPOSITION OF MALCOLM H. SNEED, III
September 28, 2015

COPY

Reported By:
Donna B. Crenshaw
Certified Court Reporter

Accurate Reporting of Shreveport, Inc.
(318) 425-1323

---

3

### INDEX OF PROCEEDINGS

Stipulations.........................4

The Witness: MALCOLM H. SNEED, III

Examination

  By Ms. Jackson.....................5

  By Mr. Hilburn...................156

| Exhibits | Page Number First Referred To: |
|----------|-------------------------------|
| 1... | 6 |
| 2... | 8 |
| 3... | 32 |
| 4... | 34 |
| 5... | 39 |
| 6... | 44 |
| 7... | 50 |
| 8... | 53 |
| 9... | 54 |
| 10... | 60 |
| 11... | 65 |
| 12... | 127 |
| 13... | 145 |
| 14... | 147 |

---

2

### APPEARANCES

APPEARING ON BEHALF OF THE PLAINTIFFS:

  MR. JOSH SANFORD
  MR. CHRISTOPHER BURKS
  MS. MARYNA JACKSON
  Sanford Law Firm, LLC
  One Financial Center
  650 South Shackleford, Suite 411
  Little Rock, Arkansas 72211
  (501) 221-0088

APPEARING ON BEHALF OF THE DEFENDANT:

  MR. CARY HILBURN
  Hilburn & Hilburn
  220 Carroll Street, Building B
  Shreveport, Louisiana 71105
  (318) 868-8810

---

4

The Rule 30(b)(6) deposition of S-3 Pump Service, Inc., Malcolm H. Sneed, III, being taken by counsel for Plaintiffs, pursuant to notice by and between counsel, for all purposes allowed under the Federal Rules of Civil Procedure, before Donna B. Crenshaw, Certified Court Reporter, at the offices of Hilburn & Hilburn, 220 Carroll Street, Building B, Shreveport, Louisiana, on the 28th day of September, 2015.

It being agreed and stipulated by and between counsel that all formalities with the exception of the swearing of the witness are waived; it being further stipulated that the reading and signing of the deposition is not waived by counsel and deponent; it being further stipulated that all objections except as to the form of the question and the responsiveness of the answer are reserved until time of trial.

---

1 office.
2 Q. Does your wife has an office?
3 A. Yes. She is my executive secretary.
4 Q. So you say you are responsible for insurance,
5 handling insurance, for S-3 Pump Service?
6 A. Yes.
7 Q. You mean workers' comp insurance?
8 A. Workers' comp, general liability; everything
9 we need.
10 Q. Okay. Do you know if S-3 Pump Service have
11 any insurance that covers this type of lawsuits?
12 A. I haven't checked, but probably not.
13 Q. Okay.
14 A. No. Cover a lawsuit like this?
15 Q. Yeah.
16 A. No, there is no insurance.
17 Q. Any lawsuits {sic} for employment-type
18 lawsuits?
19 A. No.
20 Q. Do you have workers' comp insurance?
21 A. Yes, ma'am.
22 Q. Okay. You also said that you're responsible
23 for payroll as part of S-3 Pump Service?
24 A. Well, not necessarily doing payroll, but that
25 everything is done in accordance with what we do. If

1 there's a problem with payroll, it gets wrote up, it
2 comes to me, I have to sign off on it, and we fix
3 whatever problem that was where we don't have it
4 again. That's within the corporate structure.
5 Q. So does S-3 Pump Service have a payroll
6 department?
7 A. Yes.
8 Q. How many people work there?
9 A. One and then her work is reviewed by one of
10 the vice-presidents.
11 Q. How many employees do you have right now,
12 sir?
13 A. We're way down. Probably, and I'm guessing,
14 between 70 and 80.
15 Q. And what was the highest number of employees
16 S-3 Pump Service ever had?
17 A. Last I heard was 165 at one point.
18 Q. And this one payroll person handles payroll
19 for everybody?
20 A. That is correct.
21 Q. So, no matter where employee works, in Texas,
22 in Louisiana, anywhere in the field, that one person
23 in payroll department handles payroll for every
24 worker?
25 A. That's correct.

1 Q. Okay. And then you said vice-president is
2 responsible for payroll, as well?
3 A. Vice-president of the corporate office, yes.
4 Q. Who is that?
5 A. That would be Courtney Sneed.
6 Q. Is that your daughter?
7 A. Yes, ma'am.
8 Q. What are her job duties relating to payroll?
9 A. Her job duties are to look over payroll after
10 it's been generated within the system and to okay yes,
11 we can go ahead and print checks.
12 Q. So do you report to anybody at S-3 Pump
13 Service, or you're the highest person?
14 A. It's me.
15 Q. Okay. Who reports to you?
16 A. Who reports to me?
17 Q. Yeah.
18 A. Oh, God. First off, everybody in the
19 company, but directly it would be Nicole and
20 Courtney -- well, Nicole Scates; Courtney Sneed over
21 corporate; Richard Silva, who is president of
22 operations; and then Lesley Amos, my CFO; and then
23 there's a chart that carries down below that.
24 Q. Okay. And we're going to go over
25 organizational chart a little bitter later. I think

1 you produced that in discovery. We'll show it to you,
2 but I just want to ask you some general questions
3 before we get there.
4 Q. When was S-3 Pump Service incorporated?
5 A. That would have been 1985 -- or '95, I think.
6 I'm not real sure, but it was around 1995.
7 Q. And you testified earlier that you only been
8 CEO of S-3 Pump Service for about ten years?
9 A. That's correct.
10 Q. So did you run the company for the first ten
11 years?
12 A. Yes.
13 Q. Okay. The question I'm asking, was it
14 incorporated in '95?
15 A. 2005. I'm sorry.
16 Q. 2005?
17 A. Yeah.
18 Q. Okay.
19 A. I have problems with numbers.
20 Q. That's okay. I was trying to figure out
21 because it sounded like 20 years, and I was wondering
22 what happened.
23 A. Yeah.
24 Q. So you created this company ten years ago?
25 A. Yes.

1    **Q.** And at the time when S-3 Pump Service was
2 created, you and your wife had the 50/50 ownership?
3    **A.** That's correct.
4    **Q.** And that's still how it works?
5    **A.** Yes, ma'am.
6    **Q.** And from the time when the company was
7 created, you were CEO and your wife was -- what did
8 you say was her job title?
9    **A.** Executive secretary.
10    **Q.** Executive secretary. And she has been your
11 executive secretary from the time when the company was
12 created; right?
13    **A.** Yes, you could say that.
14    **Q.** And there was no changes in ownership of the
15 company for the last ten years, was there?
16    **A.** No.
17    **Q.** Why did you create S-3 Pump Service?
18    **A.** Started it because I didn't like the way
19 Weatherford was treating its hands. It become an
20 unruly company. It started out with 5,000 people.
21 When I left, they had upwards of 65,000.
22    Me and my wife wanted to start a company. We
23 were -- we would be in control of what happened to the
24 hands, and they wouldn't be treated like they were in
25 a big corporation.

1 I own.
2    **Q.** Is it an active company?
3    **A.** Yes.
4    **Q.** Okay. When was that company created?
5    **A.** I'll have to guess. Four or five years ago.
6    **Q.** Okay. Do you own that company?
7    **A.** Yes.
8    **Q.** And does your wife own that company, too?
9    **A.** Yes.
10    **Q.** Is it the same ownership, 50/50?
11    **A.** Yes.
12    **Q.** Okay. Do you hold any positions with
13 Savannah Aviation, LLC?
14    **A.** Owner.
15    **Q.** Okay. Are you actively involved in operation
16 of Savannah Aviation, LLC?
17    **A.** Can you clarify that?
18    **Q.** Okay. Some owners, for example, just own the
19 company and not involved in business of the company.
20 You know, don't have to do anything. Let somebody
21 else run it. And, for example, some owners are
22 actively involved in operation of the business, manage
23 the company.
24    **A.** I manage the company, run it.
25    **Q.** Okay. So do you hold any job title?

1    **Q.** Okay. And what is the business of S-3 Pump
2 Service?
3    **A.** We're a pump company. Biggest majority of
4 our work is we do pump downs. On site we pump wire
5 line tools down horizontal pipe in the well.
6    Then we have miscellaneous pumping which is
7 less than five percent of the business and then some
8 acid work that we do, and that's it.
9    **Q.** Okay. Does S-3 Pump Service have any
10 subsidiaries?
11    **A.** No.
12    **Q.** Any parent companies?
13    **A.** No.
14    **Q.** Any affiliates?
15    **A.** When you say affiliates?
16    **Q.** Sister companies.
17    **A.** Are you asking me do I own other companies?
18    **Q.** No. I'm asking about right now about S-3
19 Pump Service.
20    **A.** S-3 Pump Service owns no other companies.
21    **Q.** Okay. Let me show you some documents.
22    What is Savannah Aviation, LLC?
23    **A.** Savannah Aviation?
24    **Q.** Yeah.
25    **A.** It's a holding company for some aircraft that

1    **A.** I guess it would be CEO.
2    **Q.** Where is Savannah Aviation's offices located?
3    **A.** I guess it would be Barton, Barton Drive,
4 same place Pump's corporate office is.
5    **Q.** Does Savannah Aviation share employees with
6 S-3 Pump Service?
7    **A.** My CFO does the books for it.
8    MR. HILBURN: Maryna, I'm going to insert
9 an objection just it's outside the scope of the
10 designated areas.
11    MS. JACKSON: Okay.
12 BY MS. JACKSON:
13    **Q.** And by CFO, you mean Courtney Sneed?
14    **A.** No.
15    **Q.** Who is that?
16    **A.** Lesley Amos.
17    **Q.** Lesley Amos. So Lesley Amos, she's employed
18 as the CFO of S-3 Pump Services, Inc., and she is also
19 employed as CFO of Savannah Aviation, LLC?
20    **A.** She's not employed by Savannah.
21    **Q.** Okay.
22    **A.** She does that for me when she has spare time.
23    **Q.** Do you pay her for that?
24    **A.** Pay her?
25    **Q.** Yeah.

APP 003

1    A.   Nine years.
2    Q.   Did Richard provide any work for any of these
3    companies that we just went over?
4    A.   No.
5    Q.   Okay.  So let's go back to Rule 30(b)(6)
6    deposition, the notice that we sent to you.  In the
7    first topic in that notice it says -- let me show you.
8         Do you still have it?
9    A.   I think you put it over there.  Yes, here it
10   is.
11   Q.   The first topic of the notice says,
12   "Defendant's corporate-wide organizational structure,
13   subsidiaries, parent companies, affiliates, including
14   the supervisory structure of and levels of supervision
15   since January 1, 2010."
16   A.   Okay.
17   Q.   Did we went over all companies that --
18   A.   Yes.
19   Q.   -- you had since 2010?
20   A.   Yes, ma'am.
21        MS. JACKSON:  Okay.  Let me show you some
22   documents that were produced to us during the course
23   of discovery.
24        And I'm just pulling out organizational
25   chart, Cary, for your records.

1         MR. HILBURN:  Okay.
2         MS. JACKSON:  And that's going to be
3    Exhibit 11.
4    BY MR. JACKSON:
5    Q.   And this was produced to us by your attorney
6    several days ago before this deposition.
7         Okay.  Have you seen this document before?
8    A.   Yes, ma'am.
9    Q.   Did you create this document, or somebody
10   else did?
11   A.   Well, it's updated by somebody else.
12   Q.   Okay.  Did you originally put this document
13   together?
14   A.   Years ago, our original organizational chart.
15   Q.   Okay.  So, when the -- when S-3 Pump Service
16   was created, you created organizational chart and the
17   structure of the company?
18   A.   Yes.  The bank wanted to see that.
19   Q.   Okay.  And then somebody else updated it at
20   some point?
21   A.   Through the years, that's correct.
22   Q.   But do you know who did that?
23   A.   I'm not sure.
24   Q.   Okay.  So this organizational chart shows on
25   top Mal and Linda Sneed, CEO?

1    A.   Correct.
2    Q.   Okay.  So we clarified that your wife, she's
3    not a CEO, she's just your executive secretary?
4    A.   That's correct.  She doesn't work a whole lot
5    anymore.
6    Q.   Okay.  Is she retired?
7    A.   No.
8    Q.   Are you still working every day?
9    A.   Not every day.
10   Q.   How often do you --
11   A.   Oh, me?
12   Q.   Yeah.
13   A.   No, I work every day.
14   Q.   Okay.
15   A.   I'm sorry.  I thought you meant my wife.
16   Q.   No.  No.  Let me ask -- let me ask you about
17   you first.
18        Do you still go to work every day?
19   A.   Yes, ma'am.
20   Q.   And your office is located at the 1918 Barton
21   Drive, Shreveport?
22   A.   Correct.
23   Q.   Which is the corporate office for S-3 Pump
24   Service?
25   A.   Correct.

1    Q.   You have your own personal office there?
2    A.   Yes.
3    Q.   Your wife has her own personal office there?
4    A.   Yes.
5    Q.   Okay.  What time do you usually get to work?
6    A.   7:30.
7    Q.   What time do you usually leave work?
8    A.   Depends, 6:30 to 9:00 or 10:00.
9    Q.   So you put in full day of work every day?
10   A.   Correct.
11   Q.   14, 90 hours a week, or -- I'm trying to
12   figure out how much you work, actually.
13   A.   Probably 14.  When I go home, I work.  So I
14   do 14, 15 hours of work a day easy.
15   Q.   How many hours your wife works?
16        MR. HILBURN:  I'm going to object again to
17   the extent this is outside the scope of the witness
18   designation.
19   A.   I would hate to put a number on it.
20   BY MS. JACKSON:
21   Q.   Just give me your best estimate.  I know she
22   works at home, which is --
23   A.   Six, seven hours.
24   Q.   A day?
25   A.   Yeah, if that.

1    Q.   At S-3 Pump Service?

2    A.   Yes.

3    Q.   And then you directly supervise Nicole

4  Scates, Courtney Sneed, Lesley Amos, and Richard

5  Silva?

6    A.   Correct.

7    Q.   Do you have regular meetings with these

8  people?

9    A.   On occasion, yes.

10    Q.   Okay.  Do you have any like -- you know, some

11  companies have like weekly meetings for the employees

12  where they discuss issues, what's going on, you know,

13  what plan, discuss the plan, what happened.

14        Do you have anything like that?

15    A.   Along what lines?  I'm not following you.

16    Q.   About the work.

17    A.   Are you talking about corporate?

18    Q.   Corporate, with the field employees.

19        Do you have any meetings for corporate or

20  field employees on a weekly, monthly basis when

21  everybody gets together and you guys talk about things

22  that's going on?

23    A.   The problem is getting field employees

24  together.  You can't.  They're scattered.  They're

25  working.  It's very difficult to do.

1    Q.   Okay.  So, when you need something, when you

2  need to talk to field employees, do you just call

3  them?

4    A.   There again, I'm speculating.  There's

5  someone else that knows that better.  I would assume

6  that or e-mail, or something.  I don't know.

7    Q.   Let me just ask you this.  Do you ever

8  communicate with like hands, operators, supervisors,

9  who are there at the field, or somebody else doing it

10  for you?

11    A.   As far as business wise?

12    Q.   Yes.

13    A.   No.  I do informally when I see them, talk to

14  them, but it's informal.  It's not about business.

15    Q.   So, when you -- your communications with them

16  is just -- you said I communicate with them

17  informally.

18        What do you mean?

19        MR. HILBURN:  Objection, form.

20    A.   Pass somebody in the hall, you say hi, how

21  you doing.

22  BY MS. JACKSON:

23    Q.   Okay.  So you don't discuss business; you

24  just say, hi, how are your kids, like what's going on?

25    A.   Oh, yeah.  Yeah.  You be polite.

1    Q.   Just being friendly?

2    A.   Yes.

3    Q.   But you personally don't discuss business

4  with hands or operators or supervisors who are working

5  at the job site; you have somebody else who does it

6  for you?

7    A.   Very seldom does that happen.

8    Q.   You're far away from them in the chain of

9  command to communicate with them about the work;

10  right?

11    A.   About once a year at a Christmas party I

12  discuss it.

13    Q.   Okay.  To your knowledge, how many hours

14  hands or operators work like on the per weekly basis?

15        MR. HILBURN:  Objection to the extent

16  that's outside the scope of the witness designation.

17        MS. JACKSON:  Okay.

18    A.   I'd have to -- it depends.  It varies, the

19  job they're on, what's going on.

20  BY MS. JACKSON:

21    Q.   Okay.

22    A.   That kind of thing.

23    Q.   Do you expect them to stay at their job

24  location as long as the job needs to get done?

25    A.   What do you mean?

1    Q.   Let me just ask you this.  Let me rephrase

2  that.

3        Do you -- do you have any personal knowledge

4  sitting here today how many hours hands or operators

5  work on the weekly basis?

6    A.   No.

7        MR. HILBURN:  Maryna, I'm going to object

8  again.

9        I mean, are you asking Mal Sneed

10  individually, or are you asking the company?

11        MS. JACKSON:  I'm asking if he has a

12  personal knowledge.

13        MR. HILBURN:  Mal Sneed, not the corporate

14  deposition?

15        MS. JACKSON:  Yes.

16        MR. HILBURN:  Okay.

17    A.   No.

18  BY MS. JACKSON:

19    Q.   And do you have any personal knowledge about

20  how many hours supervisors work?

21    A.   No.

22    Q.   On the weekly basis?

23    A.   No.

24    Q.   I'm just trying to get it correct for the

25  court reporter.  So let's go back to this

1  organizational chart.
2    A.  Okay.
3    Q.  It says that Nicole Scates and Courtney
4  Sneed, they are VP administration?
5    A.  Correct.
6    Q.  Okay.  And it says -- shows that they
7  supervise accounts receivable right here, human
8  resources, payroll, accounts, accounts payable,
9  administrative assistant, and IT manager?
10   A.  Correct.
11   Q.  So you have an HR department; right?
12   A.  Correct.
13   Q.  It shows that only one person is employed in
14  your HR department, James Teague; right?
15   A.  Correct.
16   Q.  What is his job duties?
17   A.  His job duties?
18   Q.  Uh-huh.
19   A.  Someone else can answer that better than me.
20  Job duties are to keep up with an array of things,
21  insurance when it comes due.
22        We have to keep up with a lot of
23  documentation on each employee.  He does that.
24  Someone has a problem with insurance, they call James
25  and he helps them with it.

1    Q.  Okay.  To your knowledge, does S-3 Pump
2  Service have a handbook for the employees?
3    A.  Yes.
4    Q.  Who put that handbook together?
5    A.  That handbook, I did the initial one.  Our
6  handbook now goes to our insurance carrier.  They
7  review it every year and deem what needs to be added
8  and what needs to be taken out.
9    Q.  Okay.  So, when you started, when you and
10  your wife started your company in 2005, right, you put
11  together the handbook for the employees?
12   A.  Correct.
13   Q.  How did you do that?  Did you just sit down
14  and write it?  Did you take a copy from somewhere and
15  just put it together?
16   A.  I used the guidelines from Weatherford
17  International is what I used.
18   Q.  Okay.  So you just took the handbook that you
19  were familiar with while you were working for
20  Weatherford International and made some changes and
21  say here you go, we're going to have this handbook?
22   A.  Correct.
23   Q.  Okay.  Did you do it on your own, or you had
24  somebody else helping you?
25   A.  I did it myself.

1    Q.  Okay.  How many employees did S-3 Pump
2  Service have when it started?
3    A.  Two.
4    Q.  You and your wife?
5    A.  That's correct.
6    Q.  Okay.  The first year when S-3 Pump Service
7  was operating, how many employees -- what is the
8  highest number of employees that it had?
9    A.  That would have been three or four.
10   Q.  Do you remember when you put this handbook
11  together?
12   A.  It was before we actually started the
13  business.
14   Q.  Okay.  What other documents did you put
15  together when you start S-3 Pump Service?
16   A.  Safety stuff, training, just everything that
17  a business owner has to put together.
18   Q.  Okay.  So training manuals was something that
19  you drafted?
20   A.  The training manuals are what oil companies
21  said we had to have and what we needed to train.
22   Q.  So where did you get that training manual?
23   A.  I don't recall.  On-line site where you
24  download modules to do training and stuff.
25   Q.  Okay.  And safety manual, the same way, you

1  just pull it from some website?
2    A.  Safety manual, basically, came from
3  Weatherford and critiqued for our business.
4    Q.  Did you make any changes?
5    A.  Oh, yeah.
6    Q.  Okay.  When you were employed at Weatherford,
7  you were working for them as the district manager;
8  right?
9    A.  Yes.
10   Q.  Okay.  And you took a lot of practices how
11  Weatherford did business to your new company?
12        MR. HILBURN:  Objection, form.
13   A.  What do you mean by practices?
14  BY MS. JACKSON:
15   Q.  Well, you basically -- you know, you adopted
16  the handbook, because you, obviously, probably like it
17  or otherwise you wouldn't take it; right?
18        MR. HILBURN:  Objection, form.
19  BY MS. JACKSON:
20   Q.  You wouldn't use it at S-3 Pump Service?
21   A.  Right.
22   Q.  So you took the handbook and adopted it for
23  S-3 Pump Service and just used that handbook; right?
24   A.  Yes.
25   Q.  Okay.  You took some other -- you said you

1  took some safety manual from them?
2  A.  I drafted mine close to theirs, yes.
3  Q.  Okay.  What other practices did you take from
4  the Weatherford and adopt at S-3 Pump Service?
5  A.  Are we talking about paper stuff?
6  Q.  Papers, yes.
7  A.  That's it.
8  Q.  That's it.  Okay.
9  What about the manner of how you pay
10  employees?
11  A.  Demeanor?
12  Q.  No, the manner.  Like, you know, employee
13  classifications, did you take it from the Weatherford?
14  A.  No.
15  Q.  How did you decide how much money you're
16  going to pay your employees?
17  A.  That depends on the market and what it takes
18  to bring good talent in.  That changes day to day in
19  the oil and gas industry.
20  Q.  Did you make the decision of whether to pay
21  employees salary or whether to pay them hourly?
22  A.  No, we did salary.
23  Q.  Okay.  Who made the decision?
24  A.  I did.
25  Q.  Okay.  And is that how Weatherford paid

1  its --
2  A.  They had some by the hour, and then some they
3  had as exempt.
4  Q.  Okay.  So, when you first hired employees --
5  A.  Correct.
6  Q.  -- who were they?
7  A.  You mean where did they come from?
8  Q.  No.  What were their job titles when S-3 Pump
9  Service hired employees?
10  A.  They start as a hand in the field.
11  Q.  So you said during the first year when S-3
12  Pump Service were operating --
13  A.  That's correct.
14  Q.  -- it was you and your wife?
15  A.  Right.
16  Q.  And you were employed as -- you were doing
17  the work of oil field worker; right?
18  A.  I was the pump operator, supervisor.
19  Q.  And you just hired several hands?
20  A.  My wife was my hand for six months.  After
21  six months, then I hired a man to be my pump hand.
22  Q.  Okay.  Did you -- how did you pay him?
23  A.  Oh, boy.  You're going way back.  I'm pretty
24  sure it was salary.
25  Q.  Okay.  Why did you make the decision to pay

1  him salary as opposed to hourly or any other way?
2  A.  Most people would rather have -- especially
3  in the oil field, would rather have a salary versus an
4  hourly wage.
5  Reason being, if you don't work one week, you
6  don't get paid.  With a salary, you always know you've
7  got X amount of money coming in.  And then they got a
8  bonus program on top of that.
9  Q.  Okay.  Did you look at any like Department of
10  Labor regulations and how to pay employees?
11  A.  Sure.  Absolutely.
12  Q.  Which regulations did you look at?
13  A.  FSLA.  You go through it.  Then you have the
14  Motor Carrier's Act which is an exemption, which all
15  my people fall under.
16  Oil field hands have to have CDLs, and we
17  have to follow federal guidelines for DOT.
18  Q.  Okay.  And which document -- I mean, did you
19  look at these documents before you hired your first
20  hands?
21  A.  I've known about those documents since I was
22  in my 30s or in my 20s.
23  Q.  Okay.
24  A.  I've been driving trucks before there was
25  CDL.

1  Q.  Okay.  And you said you based your decision
2  based on Motor Carrier Act and FSLA?
3  A.  Right, and 13(b)(1) exemption.
4  Q.  Okay.  What is 13(b)(1) exemption?
5  A.  13(b)(1) exemption states that anybody in
6  interstate commerce business, whether they move a
7  product for sale or they move their own equipment for
8  rental, so forth and so on, falls into that act.  And
9  that overtime does not have to be paid, that they're
10  exempt.
11  Q.  Okay.  So you based your decision on -- you
12  made a decision based on this 13(b)(1) exemption?
13  A.  On federal law, yes, ma'am.
14  Q.  And the federal law you're referring, this is
15  just what you described or some other law?
16  A.  I'm sorry?
17  Q.  You say you made your decision based on this
18  13(b)(1) exemption in some federal law.
19  A.  I made a decision because I grew up in the
20  trucking business.  My dad owned a trucking company.
21  When they did the safe act in 1989, and then
22  in 1992 we came out with CDLs, we got attorneys to
23  figure out what we had to do and not do.
24  Q.  Okay.
25  A.  So I've known that since I was in my 30s how

APP 007

1  you have to pay and what's exempt and what's not
2  exempt.
3      Q.  So, when you created S-3 Pump Service, Inc.,
4  right, and you started to hire employees, you started
5  to hire your hands and operators, you made your
6  decision based on your experience while you were
7  working for your father?
8      A.  And federal law.
9      Q.  And federal law.  And by federal law, I mean,
10  I'm just trying to figure out what do you mean by
11  federal law because it's just a big word that can mean
12  a lot of things?
13      A.  FSLA --
14          MR. HILBURN:  Objection, form.
15      A.  -- Motor Carrier's Act and 13(b)(1).
16  BY MS. JACKSON:
17      Q.  All right.  And you decided that everybody
18  who move --
19      A.  I didn't decide that.  An attorney told us
20  that.
21      Q.  Who was that?
22      A.  Years ago.
23      Q.  Who did that?  Who was that attorney?
24      A.  I don't remember.  He was an attorney for my
25  father.

1      Q.  Okay.  So you said that you were working for
2  your father at Ellen {sic} Service Company?
3      A.  L&S Service Company.
4      Q.  L&S.  Sorry.  And that was seven years after
5  you graduated high school you were working there?
6      A.  No.  I started driving a truck when I was 14
7  for my father moving drilling rigs.
8      Q.  Okay.  How old were you when you stopped
9  working for your dad?
10      A.  When I started?
11      Q.  Stopped working.
12      A.  I was working for him before I went to
13  Weatherford.
14      Q.  Okay.
15      A.  That would have put me at -- hang on a
16  second -- I would have been 35, 36 years of age, I
17  guess.
18      Q.  35, 36.  So let me just make sure that we've
19  got everything clear.
20          Okay?
21      A.  Okay.
22      Q.  When I went through your employment history
23  before, you said that, obviously, you were managing
24  S-3 Pump Service for the last ten years?
25      A.  Right.

1      Q.  And before, for ten years before that, you
2  were district manager for Weatherford International;
3  right?
4      A.  Correct.
5      Q.  And before that for seven years, you work --
6  you did sales in the company trucking?
7      A.  I said off and on for seven years for my dad.
8  I worked for him at different times.
9      Q.  Okay.  So almost, for almost like before you
10  started work for Weatherford, which is 20 years ago,
11  so -- until 1995, you were working for your father?
12          MR. HILBURN:  Objection, form.
13      A.  I don't have the dates in front of me, ma'am.
14  BY MS. JACKSON:
15      Q.  Okay.  Well, you were operating S-3 Pump
16  Service for ten years?
17      A.  Right.
18      Q.  That brings us back to 2005.
19      A.  Uh-huh.
20      Q.  Then, for ten years, you were district
21  manager for Weatherford International?
22      A.  Correct.
23      Q.  That brings us back to 1995.
24      A.  That's correct.
25      Q.  Okay.  So are you saying that from the time

1  you finished high school until sometime in 1995 you
2  were working for your dad on and off?
3      A.  Correct.
4      Q.  Okay.  And that at some time during that
5  time, when you were working for your dad before 1995,
6  you learned about this Motor Carrier exception and the
7  federal law and those regulations that you just cited?
8      A.  Yes.
9      Q.  Okay.  And there was some attorney who your
10  father consulted some time period like after you
11  graduated high school and before 1995 who gave you
12  this advice that --
13      A.  Yes.
14      Q.  -- the hands are exempt?
15      A.  Correct.
16      Q.  So you relied on advice somebody was given
17  sometime before 1995; right?
18      A.  Correct.
19      Q.  But you don't remember the name of that
20  attorney?
21      A.  No, ma'am, I don't.
22      Q.  Okay.  And when you started your company, did
23  you go to any attorney kind of like to get any advice
24  about whether this is still correct law or whether
25  this is right way to pay people?

1    Q.   Correct?

2    A.   Correct.

3    Q.   Okay.  And then I was trying to figure out

4  what exactly did you mean when you say oil field

5  exemption.

6         And you said that your understanding of the

7  full oil field exemption had to do with driver logs;

8  right?

9         MR. HILBURN:  Objection, form.

10   A.   It has to do with driver logs, but it also

11  designates when the hand is on duty and off duty.  On

12  duty is when he is in the act of physically doing

13  work.  Off duty is when he's at rest, he's not doing

14  anything on the job site.

15       In the oil industry, you may go days and sit

16  there and not do anything that you're supposed to do

17  at the well site because of problems.

18  BY MS. JACKSON:

19   Q.   Okay.

20   A.   So, therefore, they're not working.

21   Q.   Okay.  So your understanding of this change

22  in 2007, that they had to deal with the way hands or

23  supervisors had to fill driver logs and with the way

24  that, if they're on the job site and not working, that

25  time is not working time?

1         MR. HILBURN:  Objection, form.

2  BY MS. JACKSON:

3    Q.   Right?

4    A.   Correct.

5    Q.   Okay.  And that's the only change that was

6  made in 2007 to the Motor Carrier Act, to your

7  knowledge?

8    A.   Going off my memory from seven years ago, I

9  think that's correct.

10   Q.   Okay.  Going off your memory, to your

11  personal knowledge, were there any other examinations

12  of the law or anything else that you did from 2005 to

13  2015 to determine if there were any changes made in

14  the law, if you're still classifying people correctly?

15       MR. HILBURN:  Are you asking S-3 Pump, or

16  are you asking Mal Sneed?

17       MS. JACKSON:  S-3 Pump Service.

18   A.   Ask me the question again, please.

19  BY MS. JACKSON:

20   Q.   Okay.  From 2005 until 2015, did S-3 Pump

21  Service do anything else other than what you just

22  testified about changes in the law made in 2007 and

23  your analyzing those changes, was there anything else

24  that was done at S-3 Pump Service?

25   A.   I've answered that question already.  I told

1  you I study the law at least once a year.

2    Q.   You personally?

3    A.   Every year.

4    Q.   Okay.  Anything else that's done at S-3 Pump

5  Service other than that?

6    A.   Yes.  There's all kind of articles in the oil

7  field about -- and transportation companies, about

8  what to do, what laws are coming.  I read those.

9    Q.   Okay.

10   A.   Okay.  That's my job.

11   Q.   Okay.

12   A.   I haul heavy equipment.  I am -- federal

13  government regulates everything I do, say, or anything

14  else, and I have to follow those laws and we do.

15   Q.   Sure.  Okay.  So you read -- you personally

16  read articles, make sure nothing changed, and you're

17  making those decisions?

18       MR. HILBURN:  Objection, form.

19   A.   Right.

20  BY MS. JACKSON:

21   Q.   Right, sir?

22   A.   Correct.

23   Q.   Let's go back to this organizational chart.

24   A.   Okay.

25   Q.   We were talking about James Teague, human

1  resources, and you said that you hired him about four

2  years ago?

3    A.   Three or four.

4    Q.   What is his responsibilities?

5    A.   Human resources.

6    Q.   Well, different --

7    A.   Insurance.  Insurance.  Oh, God, just a gamut

8  of things.  Anything and everything that relates from

9  the employee to us is what he handles.

10   Q.   Okay.  Does he hire employees?

11   A.   Occasionally.

12   Q.   Who usually hires employees at S-3 Pump

13  Service?

14   A.   For years it's been Jason Martin or Richard

15  or one of the other managers.

16       MR. SANFORD:  We're going to go off the

17  record for just a second.

18       (Whereupon, there was a discussion held

19  off the record)

20  BY MS. JACKSON:

21   Q.   So my question is:  Who at S-3 Pump Service

22  hires employees?

23   A.   Majority were hired by Jason Martin.

24   Q.   And can you point where is he?

25   A.   He's the district manager for North

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| JASON ROCHE, ET AL, Each | : | |
| Individually and on behalf of | : | |
| All Others Similarly Situated | : | |
| | : | |
| VERSUS | : | NO. 5:15-cv-268-XR |
| | : | |
| S-3 PUMP SERVICE, INC. | : | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

30(b)(6) DEPOSITION OF LESLEY AMOS

SEPTEMBER 29, 2015

Reported By:
Pamela R. Crenshaw, CCR

1       do so.

2             MS. JACKSON: It has not been. That's

3             why I would like to clarify it.

4   BY MS. JACKSON:

5      Q   What is the process of how S3 Pump Services

6   hires hands or supervisors?

7      A   Generally the process starts with a

8   prospective employer reaching out to us. Either they

9   know someone that works for us or they're family with

10  someone that works for us. And they start with an

11  employment application.

12        We have those online. We also have that where

13  you can download it online. We also will provide it if

14  you come in our office.

15        That is then reviewed by an operations manager

16  or our Human Resources department and forwarded to the

17  appropriate operations manager. At that point the

18  decision is made if they want to bring someone in to

19  interview.

20        When they're brought in to interview, the

21  rotation schedule would be explained to them, the pay

22  would be explained to them, what they're being hired

23  for, which we generally always hire pump assistants or

24  hands. And then after a time goes by, you may or may

25  not be promoted to pump supervisor.

1    Then as I mentioned previously, we have to

2 invest, you know, money in to meet all of our DOT

3 requirements.  And so if the interview process -- if the

4 person thought that they were going to be a good fit,

5 then we would start the process.  And we generally start

6 with using a third -- we use a third-party agency and we

7 pull their motor vehicle record, their MVR, and a

8 background check.

9    Those two we do initially, because if things

10 come up on those that are going to prevent you from

11 being employed, then we don't waste the time on drug and

12 alcohol testing and all the other things that we have to

13 do for DOT.

14    If those are clear or clean and we can move

15 forward, then we would go ahead and schedule the drug

16 and alcohol testing through a third party.  We would,

17 you know, follow-up -- basically get everything that's

18 in that DQ file, the driver qualifications, get all of

19 that in there so that we can make sure that they're able

20 to drive for us and work for us.

21    Q    And is that process of hiring employees the

22 same for all occasions?

23    A    Yes.

24    Q    No matter whether they're employed in Ohio,

25 Texas, Louisiana?

1      A      Yeah.   Generally everyone fills out the

2  application.   Now, a manager -- you know, if the person

3  is in South Texas they might be interviewed by an

4  operation manager in South Texas.   If they're here and

5  might be going to work for us in South Texas, they would

6  get interviewed here, because that's where they are.

7      Q      So the only difference is location of the

8  interviewer?

9      A      Right.

10     Q      Who usually participates in interviews?

11     A      It's generally just our operations manager or

12  our Human Resources employee.   And it's not both.   I

13  would think that if one of our operations manager here

14  locally called and wanted to interview, that person

15  would come to our --

16     Q      So who usually makes a decision about hiring

17  or not hiring an employee?

18     A      Our operations manager would make the initial

19  decision on if they wanted to invest the time.   But

20  several of these things that we have to do might

21  eliminate them.

22          Like if their doctor won't say they're

23  physically fit to perform, you know, and issue them a

24  medical card, then they might be out of the process.

25          So even though the operations manager might

APP 013

1    have said yes this is someone I'm interested in, he has

2    good experience, if he can't meet the requirements it

3    might not be someone that ultimately gets hired.

4        Q    And usually just operation manager or the HR

5    person who does the interview?

6        A    That's right.  If you know someone within our

7    organization, then it might be, you know, president of

8    operations or someone of that nature.

9             But generally it's the operations manager.

10   And they're the one that's going to be setting the

11   schedule and they're able to explain, you know, what

12   your rotation would be and when you would start, things

13   of that nature.

14       Q    Do you know what factors, what qualifications,

15   that S3 Pump Services looks for in a hand?

16       A    Well, for hands and pump supervisors you have

17   to have your CDL, because every one of our field

18   employees are expected to drive our equipment, which

19   it's interstate so it's going to be -- we work in

20   Louisiana, Texas, Mississippi, Ohio.  We've done work in

21   North Dakota before.  So you have to have your CDL to

22   even be considered.

23            And on the online application it asks do you

24   have a CDL.

25       Q    Anything else, other than CDL, is required to

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| JASON ROCHE, ET AL, Each Individually and on behalf of All Others Similarly Situated | : : : | |
| | : | |
| VERSUS | : | NO. 5:15-cv-268-XR |
| | : | |
| S-3 PUMP SERVICE, INC. | : | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF JASON ROCHE

SEPTEMBER 30, 2015

Reported By:
Pamela R. Crenshaw, CCR

APP 015

1   January 9th but officially on their paper I think it was

2   January 11th of 2012.

3       Q       That's when you started with S3?

4       A       Yes.

5       Q       Lawsuit history.  Ever filed a lawsuit?

6       A       Never.

7       Q       Never been a party defendant in a lawsuit?

8       A       No, sir.

9       Q       Never given deposition testimony.  Any

10  criminal record at all?

11      A       Not that I'm aware of.

12      Q       How did you -- tell me the process of you

13  coming to work for S3 Pump.  How did you hear about S3?

14      A       My little brother -- actually Trey Brice --

15  while I was still in I was starting to network before I

16  got out of the Marine Corps so I could come out pretty

17  much on my feet running.

18              And Trey Brice told me to come talk to him.  I

19  talked to him.  And two days later I went up there on

20  Monday on the 9th and dropped off an application.

21  Talked to David Blain.  Seen my secret security

22  clearance that I had and told me you're hired.

23      Q       So through trey Brice and David Blain is where

24  you got your initial information about S3 Pump?

25      A       Correct.

1  A   Correct.

2      MR. HILBURN:  Objection; form.

3  A   Correct.

4  BY MS. JACKSON:

5  Q   Did you drive pickup trucks with no

6  attachments from one state to another?

7  A   State to state?  No.

8  Q   Did you ever cross the state lines in pickup

9  trucks?

10  A   In a personal pickup, not a company.

11  Q   How often did you perform pretrip and post

12  trip inspection on pickups?

13  A   Every day.  You started when you get on the

14  job.  Or shift anyways.

15  Q   Did you ever drive Ranger from location to

16  location?

17  A   Yes, I did.

18  Q   You testified earlier about you driving

19  Peterbilt truck?

20  A   Several, yes, I have.

21  Q   Couple times?

22  A   Few times.

23  Q   But you didn't expect to drive Peterbilt

24  trucks every day as a part of your job duties, did you?

25  A   No, I did not.

1  Q   You did not expect to drive Peterbilt trucks

2  weekly as a part of your job duties?

3  A   No, I did not.

4  Q   So this was just a random thing that you did

5  once or twice in the entire time you were employed?

6  A   During the 14 day period, you rig down and rig

7  up, move over from one location to location maybe once

8  in a two week hitch.  So twice a month you might catch

9  one of them.  So yeah.

10  Q   You testified that you put all your driving

11  hours in your logbooks, right?

12  A   Yes.

13  Q   You put hours that you spent driving pickups

14  with or without equipment in logbooks?

15  A   Yes.

16  Q   So how many hours could you drive per day?

17  A   Max drive hours is -- I think it's ten drive

18  hours.  If you have 14 total, that's -- the other four

19  is including loading/unloading that you're driving

20  18-wheeler.

21  Q   So majority of your driving time, was it spent

22  driving pickups?

23  A   Majority of it was pickups.

24  Q   Did you pretty much exhaust all your driving

25  hours on that pickup?  Driving pickup trucks?

1  A   I'd drive maybe two hours a day; hour

2  location, hour back.

3      MS. JACKSON:  Thank you.  No more

4  questions.

5      MR. HILBURN:  No questions.

6      MS. JACKSON:  Thanks.  You're done.

7      (End of Proceedings.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      C E R T I F I C A T E

2

3  STATE OF LOUISIANA:

4  PARISH OF CADDO    :

5

6      I, PAMELA R. CRENSHAW, Certified Court

7  Reporter, in and for the State of Louisiana, as the

8  officer before whom this testimony was taken, do

9  hereby certify that JASON ROCHE, after having been

10  duly sworn by me upon authority of R.S. 37:2554, did

11  testify as hereinabove set forth in the foregoing 47

12  pages.

13      I further certify that this testimony was

14  reported by me in the stenotype reporting method,

15  was prepared and transcribed by me or under my

16  personal direction and supervision, and is a true

17  and correct transcript to the best of my ability and

18  understanding.

19      I further certify that the transcript has been

20  prepared in compliance with transcript format

21  guidelines required by statute or by rules of the

22  board, that I have acted in compliance with the

23  prohibition on contractual relationships, as defined

24  by Louisiana Code of Civil Procedure Article 1434

25  and in rules and advisory opinions of the board.

APP 017

**49**

1     I further certify that I am not employed by nor
2 related to any of the parties to this cause nor in
3 any way interested in the event thereof.
4     SUBSCRIBED AND SWORN to the 12th day of
5 October, 2015.
6
7
8               _Pam Crenshaw_
9           PAMELA R. CRENSHAW, CCR
           CCR #99014
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**50**

1 CHANGES AND SIGNATURE
2 WITNESS NAME: **JASON ROCHE**
3 DATE OF DEPOSITION:   SEPTEMBER 30, 2015
4 PAGE LINE     CHANGE         REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

---

**51**

1     I, **JASON ROCHE**, have read the foregoing deposition
2 and hereby affix my signature that same is true and
3 correct, except as noted above.
4
5
6           _____
7             **JASON ROCHE**
8 STATE OF LOUISIANA.
9 PARISH OF CADDO:
10     Before me, the undersigned authority, on this day
11 personally appeared, **JASON ROCHE**, known to me (or proved
12 to me under oath or through _____)
13 (description of identity card or other document) to be
14 the person whose name is subscribed to me that they
15 executed the same for the purpose and consideration
16 therein expressed.
17     Given under my hand and seal of office this
18 day of    , 2015.
19
20           _____
21            NOTARY PUBLIC
22
23
24
25

APP 018

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| JASON ROCHE, ET AL, Each Individually and on behalf of All Others Similarly Situated | : : : | |
| | : | |
| VERSUS | : | NO. 5:15-cv-268-XR |
| | : | |
| S-3 PUMP SERVICE, INC. | : | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF JAMES W. WEDGEWORTH

OCTOBER 2, 2015

Reported By:
Pamela R. Crenshaw, CCR

1    Q    Do you remember anything about the

2    application?  Did it talk about any kind of job

3    requirements?

4    A    No.

5         MR. SANFORD:  Hold on.  Object to form.

6         Go ahead.

7    A    No.  It -- just standard application.

8    BY MR. HILBURN:

9    Q    Name?  Address?  Previous employments?

10   A    Basic stuff.  Yeah, previous employments.

11   Q    What was your next encounter with S3 Pump in

12   terms of following-up on that job application?

13   A    I called to follow-up on the application, and

14   they said they -- they set a time.  I don't remember the

15   exact time or day.  They said, Why don't you come in,

16   sit down and talk with us.  So I did that.

17   Q    Do you remember the year?

18   A    Last year.

19   Q    About this time last year, huh?

20   September 2014?

21   A    It was end of August.

22   Q    And so tell me about the phone call.

23   A    I called and said I was trying to figure out

24   the status of the application.  They said, yeah, come on

25   in and talk to us.  It was basically about that much.

1          And then so I went in and talked to them.  I

2    talked to Jason Martin.

3       Q    Do you remember what his position was at the

4    time?

5       A    You know, I never really knew what his

6    position was.  I just knew it was a position above an

7    entry level, because he had his own desk and office.

8    There was really no title or anything.

9       Q    So this would have been over on Barton Road

10   then?

11      A    No.

12      Q    No?  Hamilton?

13      A    Yep.

14      Q    And was he the only person you met with this

15   time?

16      A    That's correct.

17      Q    Tell me about the meeting.

18      A    He explained to me there was a salary and then

19   he explained about the bonuses.  And I asked him, I

20   said, Where would we be going?  He said, Well, you can

21   go one of three ways.  You can either go South Texas,

22   West Texas, or north to Ohio.  You'll be gone two

23   weeks -- it's a two week hitch; you'll be gone two weeks

24   and off a week.

25          That was probably pretty much the long and

1   short of it.  It didn't really cover a whole lot.  It

2   was really vague.

3       Q    Do you remember did he tell you at that time

4   what the salary would be?

5       A    He told me what the salary would be.

6       Q    Do you remember the number?

7       A    No, I don't.  I don't.

8       Q    Did he tell you what the bonus would be?

9       A    Yes.

10      Q    What was that?

11      A    175 a day if we pumped.

12      Q    And if you didn't pump, you didn't get a

13  bonus?

14      A    That's correct.

15      Q    And did it turn out that's how you were

16  actually paid, this -- whatever this salary was plus the

17  175 a day bonus?

18      A    Actually, no.  They paid me $200 a month less

19  than what they promised me salary at hiring.  But it

20  didn't matter, because I was there for the bonuses.

21      Q    Right.  So whatever the number was they

22  mentioned to you during one of these meetings as to what

23  the salary was, it ended up being about $200 less than

24  what you understood it was going to be?

25      A    Per month, uh-huh.  That's correct.

1    Q    During this meeting with Jason Martin, did you

2  guys talk about job qualifications?

3    A    No.  He asked me if I'd worked in the

4  oilfield.  He goes, yeah, I see here Halliburton, okay.

5  But that was really about all that was said.  It really,

6  to be honest with you, was nonchalant.  Didn't seem like

7  it really mattered.  Because I was being hired -- I was

8  hired in an entry level position, which was an oilfield

9  hand.

10        So I think the fact that they had hands with

11 supervisors, so it's kind of like OJT, on-the-job

12 training, so I was going to be supervised.  But it

13 really wasn't -- he really didn't even press on it

14 really.

15   Q    He knew you had your CDL?

16             MR. SANFORD:  Hold on.

17   A    No.

18             MR. SANFORD:  Hold on.  Object to form.

19        Go ahead.

20   A    No.  He never mentioned anything about a CDL.

21 BY MR. HILBURN:

22   Q    But you had given him your job history and

23 shown that you'd been driving --

24   A    There was a section on the application if you

25 had that information.  You put your driver's license

**65**

**CERTIFICATE**

STATE OF LOUISIANA:

PARISH OF CADDO   :

I, PAMELA R. CRENSHAW, Certified Court
Reporter, in and for the State of Louisiana, as the
officer before whom this testimony was taken, do
hereby certify that JAMES W. WEDGEWORTH, after
having been duly sworn by me upon authority of R.S.
37:2554, did testify as hereinabove set forth in the
foregoing 64 pages.

I further certify that this testimony was
reported by me in the stenotype reporting method,
was prepared and transcribed by me or under my
personal direction and supervision, and is a true
and correct transcript to the best of my ability and
understanding.

I further certify that the transcript has been
prepared in compliance with transcript format
guidelines required by statute or by rules of the
board, that I have acted in compliance with the
prohibition on contractual relationships, as defined
by Louisiana Code of Civil Procedure Article 1434
and in rules and advisory opinions of the board.

---

**66**

I further certify that I am not employed by nor
related to any of the parties to this cause nor in
any way interested in the event thereof.

SUBSCRIBED AND SWORN to the 13th day of
October, 2015.

_Pamela R Crenshaw_
PAMELA R. CRENSHAW, CCR
CCR #99014

---

**67**

CHANGES AND SIGNATURE

WITNESS NAME:  JAMES W. WEDGEWORTH

DATE OF DEPOSITION:  OCTOBER 2, 2015

PAGE LINE        CHANGE                REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

---

**68**

I, JAMES W. WEDGEWORTH, have read the foregoing
deposition and hereby affix my signature that same is
true and correct, except as noted above.

_____
JAMES W. WEDGEWORTH

STATE OF LOUISIANA.

PARISH OF CADDO:

Before me, the undersigned authority, on this day
personally appeared, JAMES W. WEDGEWORTH, known to me
(or proved to me under oath or through _____)
(description of identity card or other document) to be
the person whose name is subscribed to me that they
executed the same for the purpose and consideration
therein expressed.

Given under my hand and seal of office this
day of    , 2015.

_____
NOTARY PUBLIC

APP 024

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * *

JASON ROCHE, ET AL, Each   :
Individually and on behalf of  :
All Others Similarly Situated  :
   :
VERSUS   :  NO. 5:15-cv-268-XR
   :
S-3 PUMP SERVICE, INC.  :

* * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF MICHAEL JOSEY

SEPTEMBER 30, 2015

Reported By:
Pamela R. Crenshaw, CCR

1   Pump?

2       A    He told me the pay and the benefits were

3   better than Schlumberger and then he would pass the

4   phone off to the assistant manager in Dilley, Texas, and

5   me and him would talk about how I already got the job,

6   come on down, just leave Schlumberger.

7       Q    And you did that?

8       A    I went on days off with Schlumberger and went

9   into the office and told them I was leaving, and went to

10   S3, filled out an application, talked to Perry

11   Pippenger.

12       I believe that same day he told me I was hired

13   after he found out my experience from frac at

14   Schlumberger.  Said, Remember, save your hours.  And

15   then I believe I went to talk to one of the ladies in HR

16   to fill everything out.  And not too long after that I

17   was headed to Dilley, Texas.

18       Q    What did your brother tell you the pay and

19   benefits would be before he handed the phone off to --

20       A    He didn't exactly tell me exactly what the pay

21   was.  He told me that the benefits were paid insurance

22   for the family.

23       Q    You didn't know what you were going to be paid

24   when you started work then?

25       A    It had to --

1    Q    And when you did that, was it -- was it ever

2    untrailered? Without a trailer?

3    A    Ninety percent of the time, 95 percent of the

4    time.

5    Q    It was?

6    A    Untrailered.

7    Q    Did you ever have occasion to drive an F-250

8    without doing a pretrip inspection?

9    A    Drive my F-250?

10    Q    Yeah.

11    A    No, sir.

12    Q    Were you required by S3 to do a pretrip

13    inspection of the F-250?

14    A    I don't recall if that was a requirement by

15    them or not. It's just something you do to prevent

16    problems. You might go down the road and lock the

17    engine up if you didn't check the oil and stuff.

18          MR. SANFORD: Pass.

19          MR. HILBURN: I think we're done.

20          MR. SANFORD: We're going to read and

21        sign.

22          (End of Proceedings.)

23

24

25

1            C E R T I F I C A T E

2

3    STATE OF LOUISIANA:

4    PARISH OF CADDO  :

5

6        I, PAMELA R. CRENSHAW, Certified Court

7    Reporter, in and for the State of Louisiana, as the

8    officer before whom this testimony was taken, do

9    hereby certify that MICHAEL JOSEY, after having been

10    duly sworn by me upon authority of R.S. 37:2554, did

11    testify as hereinabove set forth in the foregoing 49

12    pages.

13        I further certify that this testimony was

14    reported by me in the stenotype reporting method,

15    was prepared and transcribed by me or under my

16    personal direction and supervision, and is a true

17    and correct transcript to the best of my ability and

18    understanding.

19        I further certify that the transcript has been

20    prepared in compliance with transcript format

21    guidelines required by statute or by rules of the

22    board, that I have acted in compliance with the

23    prohibition on contractual relationships, as defined

24    by Louisiana Code of Civil Procedure Article 1434

25    and in rules and advisory opinions of the board.

1        I further certify that I am not employed by nor

2    related to any of the parties to this cause nor in

3    any way interested in the event thereof.

4      SUBSCRIBED AND SWORN to the 12th day of

5    October, 2015.

6

7

8                 PAMELA R. CRENSHAW, CCR

9                 CCR #99014

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CHANGES AND SIGNATURE

2    WITNESS NAME: MICHAEL JOSEY

3    DATE OF DEPOSITION: SEPTEMBER 30, 2015

4    PAGE LINE      CHANGE          REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____

In the United States District Court
Western District of Texas
San Antonio Division

| | |
|---|---|
| Jason Roche, et al.,<br>　　　　　　Plaintiffs<br><br>v.<br><br>S-3 Pump Service, Inc., et al.,<br>　　　　　　Defendants. | Cause No. 5:15-cv-268-XR<br><br>Judge Xavier Rodriguez<br><br>Magistrate Primomo |

## Declaration of Linda Sneed

1.　　My name is Linda Sneed.  I am of sound mind, over the age of 18, and capable of making this Declaration based upon my personal knowledge as a 50% shareholder of S3 Pump Service, Inc., and as an S3 Pump employee in the capacity of executive secretary to Malcolm Sneed since at least 2005.

2.　　I am not responsible for payroll and do not perform any payroll functions for S3 Pump.  I do not troubleshoot or sign off on solutions to any payroll problems with S3 Pump.

3.　　There are no S3 Pump employees who report to me.

4.　　I have not played any role in developing or implementing any employee or payroll policies of S3 Pump since at least prior to 2011.

5.      I do not possess the power to hire and fire employees at S3 Pump and have never hired or fired any employees with S3 Pump.  In particular, I have never hired or fired or been involved in the hiring or firing of field hands or supervisors for S3 Pump.

6.      I do not supervise or control any employee work schedules or conditions of employment.  Specifically, I do not supervise or control the work schedules or conditions of employment for any of the plaintiff field hands or supervisors.

7.      I do not determine the rate or method of payment of any S3 Pump employees, particularly that of the plaintiff field hands or supervisors.

8.      I do not maintain employment records for S3 Pump.


I declare under penalty of perjury that the foregoing writing is true and correct.



_Linda Sneed_ _____        ___12/1/15_____
Linda Sneed                                              Date

In the United States District Court
Western District of Texas
San Antonio Division

| | |
|---|---|
| Jason Roche, et al., <br>           Plaintiffs <br><br> v. <br><br> S-3 Pump Service, Inc., et al., <br>           Defendants. | Cause No. 5:15-cv-268-XR <br><br> Judge Xavier Rodriguez <br><br> Magistrate Primomo |

## Declaration of Lesley Amos

1.     My name is Lesley Amos. I am of sound mind, over the age of 18, and capable of making this Declaration based upon my personal knowledge as chief financial officer of S3 Pump Service, Inc.

2.     I was involved in an inquiry into S3 Pump pay practices by the U.S. Department of Labor during 2015. During the inquiry, the U.S. Department of Labor (DOL) interviewed a number of employees, including some field hands and supervisors who perform the same functions as the plaintiff employees in this case. Additionally, the DOL investigators interviewed a number of upper management, payroll, accounts payable and human resources personnel, including myself.

3.     Malcolm Sneed was not interviewed by the DOL during that investigation.

APP 030

I declare under penalty of perjury that the foregoing writing is true and correct.

_Lesley Amos_     _12-1-2015_
Lesley Amos        Date

APP 031